UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KENNETH MOTLEY, | |
| Plaintiff, | Case No. 16-CV-06642 |
| v. | Judge John Robert Blakey |
| IAMAW DISTRICT LODGE 141, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Kenneth Motley, worked as a ramp serviceman at United Airlines from 1999 until his termination in 2015. United terminated Motley after he got into a verbal altercation with another passenger on a United flight. Defendant IAMAW District Lodge 141, a labor union, represented Plaintiff in proceedings contesting his termination. District Lodge appealed Motley's case once, and when District Lodge decided not to appeal Motley's case a second time, Motley sued District Lodge alleging racial discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. District Lodge moved for summary judgment. For the reasons explained below, this Court grants Defendant's motion.

I.   Background[1]

   A.   **The Incident Leading to Termination**

Motley worked as a United Airlines fleet service employee (specifically, as a ramp serviceman) from 1999 until 2015. [66] ¶ 8; [75-2] ¶ 1. On February 25, 2015, Motley took medical leave from work and used his employee pass privileges to take a flight from Chicago to Oklahoma City, during which he had a verbal altercation with the female passenger seated next to him. [66] ¶ 8–9. At the time of the altercation, Motley wore braids, an Armani suit, black dress shoes, a silver chain, and a United-issued Carhartt jacket. [75-2] ¶ 3. During the flight, Motley listened to music by the group Enigma (and not rap music). *Id.* ¶ 4. In a statement submitted to United, the female passenger described Motley's music as having a "rap type sound." *Id.* ¶ 8.

According to Motley, the dispute started when the female passenger became upset at Motley's indifference to a medical emergency occurring elsewhere on the plane, whereupon she called Motley an asshole and hit him in the leg with her fist three times. *Id.* ¶ 6. In a statement Motley submitted to United, Motley stated that he feared for his safety during this incident. *Id.* Motley also stated that the passenger grabbed his coat "and plopped it on my side of the seat hitting me 3 times . . . ." [66] ¶ 10. Then, according to a complaint the passenger filed with United, Motley loudly told the passenger, "you are just a fucking white bitch," then texted someone words to the effect that "I [the passenger] was being such a pain" and "wanted to 'lay me

---
[1] The Court's recitation of facts is taken from Defendant's Local Rule 56.1 statement of material facts [66] and Plaintiff's response thereto [75-3]; Plaintiff's Local Rule 56.1 statement of additional facts [75-2] and Defendant's response thereto [77]; as well as the record evidence, including the documents cited in the parties' statements of fact and the depositions of Plaintiff [35] and Erik Stenberg [70].

2

out.'" *Id.* ¶ 9. In his statement, Motley conceded that, after the passenger moved Motley's arm, Motley said, "Lady, don't you ever put your fucking hands on me again." *Id.* ¶ 10. Motley also wrote that he called his friend on his cell phone and said, while still sitting next to the other passenger, "I don't trust this white bitch, . . . if some motherfuckers come at me it's going down. Ima need you to whoop this bitch ass." *Id.* (ellipses added).

A statement from a flight attendant on the flight indicated that she intervened and moved the passenger away from Motley to diffuse the situation. [67-8] at 6. A statement from the taxi driver who coincidentally transported Plaintiff to his hotel after the flight and then transported the passenger to her hotel after the flight (there were only two taxi drivers working the airport that night) indicated that: Plaintiff was agitated and obnoxious during the car ride, using profanity to describe the female passenger who complained about him on the flight; and the passenger "started talking about how rough her trip to Oklahoma City was due to an obnoxious African American who would not be quiet the entire trip but rather complained about everything in very vulgar terms." *Id.* at 7.

On June 4, 2015, United fired Motley, purportedly because of this incident. [75-2] ¶ 7.

B.  **Investigation, Grievance & Arbitration Proceedings**

United employees are subject to company rules called the "Working Together Guidelines" (the Guidelines), which require employees to "[a]ct in ways that reflect favorably on the company, yourself and your co-workers" and "[r]efrain from

3

aggressive or threatening behavior, whether through words or actions." [66] ¶ 3–4. The Guidelines also discourage using company travel privileges while on sick leave. *Id.* ¶ 4. The Guidelines further provide that, if United receives "a complaint regarding a pass rider who uses inappropriate or offensive language or behavior, we will consider taking corrective measures, including suspending or terminating travel pass privileges in particularly egregious situations." [75-2] ¶ 16. Finally, the Guidelines provide that "[f]ailure to comply with any of these guidelines may result in disciplinary action up to and including termination of employment." [66] ¶ 5.

United and District Lodge are parties to a collective bargaining agreement covering fleet service employees, which includes an investigation, grievance, and arbitration process for disciplined or discharged employees. *Id.* ¶ 2, 6. Pursuant to this process, United is required to conduct an investigatory meeting to discuss proposed employee discipline (step one). *Id.* ¶ 6. If United decides to pursue discipline, the CBA requires United to hold an investigative hearing at which District Lodge may represent the employee (step two). *Id.* If United decides in the wake of that investigative hearing to discipline the employee, the CBA provides for a Step 3 process, which involves a review by both the employer and the union. *Id.* After the employer submits a written answer in the Step 3 process, the CBA allows the union to request a hearing before a three-member arbitration panel (known as the System Board of Adjustment), which results in a binding arbitration. *Id.* Not all disciplinary matters proceed to arbitration; rather, the union reviews the case following a Step 3 decision and decides whether to pursue an appeal to arbitration. *Id.* ¶ 7. Erik

Stenberg, District Lodge Assistant General Chairman, testified that the union takes a relatively small percentage of cases to arbitration; during his tenure at United he has handled hundreds of cases and pursued arbitration in only 20 to 25 of them. [70] at 6, 38, 41.

Consistent with this process, on April 3, 2015, United held an investigatory meeting in Motley's case. [75-2] ¶ 9. Although the parties agree that the District Lodge represented Motley at this meeting, they disagree about who his representative was: Plaintiff claims that Erik Stenberg represented him at this meeting, [75-2] ¶ 9; and Defendant claims that Vincent Taylor represented Motley at the investigatory meeting stage, [77] ¶ 9. In any case, at the close of the meeting, United determined that Motley had violated the Guidelines by exhibiting "egregiously rude and aggressive behavior." [66] ¶ 11. The step one decision, issued April 27, 2015, proposed termination effective immediately in light of the severity of the conduct, and noted that Plaintiff's "egregiously rude and aggressive behavior toward [the female passenger in 18D] caused her to contact the company and complain that not only was she shocked [by] your behavior, but she was also afraid for her safety." [67-3]. The decision also noted Plaintiff's statement, in which Plaintiff admitted saying "Lady, don't you ever put your fucking hands on me again," as well as a statement from the flight attendant who worked to reseat the passenger and a statement from the cab driver who drove both Plaintiff and the passenger after the flight. *Id.*

5

On June 4, 2015, United held an investigative hearing to determine the appropriate discipline, and Defendant again represented Motley, who submitted an additional, 17-page statement about the incident. [66] ¶ 12. The presiding hearing officer determined that Motley should be terminated because he violated the Guidelines by exhibiting profane, disrespectful, and threatening behavior. [66] ¶ 13.

On July 2, 2015, District Lodge appealed Motley's termination to the Step 3 stage. *Id.* ¶ 14. Assistant General Chairman Erik Stenberg, who Plaintiff claims worked on his case before the Step 3 meeting, met with Motley in advance of the review to discuss his Step 3 appeal. *Id.* ¶ 15. The Step 3 review occurred on September 10, 2015; at that time, Motley testified on his own behalf. *Id.* ¶ 16. Stenberg, on Motley's behalf, asked the hearing officer not to terminate Motley, considering Motley's many years of service and personal hardships. *Id.* ¶ 16. Motley testified at his deposition that he was satisfied with Stenberg's work on his case, indicating that Stenberg: "represented me exceptionally well"; "has always represented me and . . . always given me true advice"; and "has never done me wrong"; Motley testified that "to this day I still stand by Erik Stenberg's work ethic." *Id.* ¶ 17; [35] at 7, 33.

United denied Motley's appeal on November 3, 2015. [66] ¶ 18. According to District Lodge, after this denial, Stenberg conferred with other District Lodge representatives to consider whether to appeal Motley's case to arbitration. *Id.* ¶ 19. In deciding whether to seek review with the System Board of Adjustment, Stenberg, along with the other representatives, reviewed Motley's case as well as prior System

Board decisions. *Id.* Stenberg had represented United employees in seven cases that proceeded to arbitration (the majority of which involved African-American union members), and he relied upon his experience in deciding whether to seek arbitration in Motley's case. *Id.* ¶ 24. In making their decision, the representatives did not review any prior System Board decisions specifically involving off-duty conduct like Motley's conduct. [75-2] ¶ 12. Nor did they seek to expand the record by seeking any additional statements from the taxi driver, the flight attendant, or the passenger, or by trying to identify any potential new witnesses to the incident. *Id.* ¶ 11.

According to District Lodge, the group of District Lodge representatives decided not to appeal Motley's case to arbitration because they did not think an appeal would succeed. In particular, Stenberg and his conferees determined that the following facts would undermine the success of any appeal: (1) Motley was using employee pass privileges on the date of the incident and had taken medical leave from work that day; and (2) a passenger statement and several witness statements (including Motley's statements) detailed the incident and demonstrated that Plaintiff had used profanity and threatened another passenger. [66] ¶ 21. When asked at his deposition whether he believed Motley feared for his safety during the altercation with the passenger, Stenberg responded, "I did not." [70] at 45. In Stenberg's view, Motley was "the aggressor." *Id.* at 40. When asked whether he believed Motley was assaulted, as Motley claimed, Stenberg testified, "I believe he probably was poked and he probably had a jacket thrown over the armrest." *Id.* at 41. Stenberg also stated that Motley had an "active discipline" on his employee record, which further

7

weakened the union's chances of succeeding at arbitration. *Id.* at 32. Stenberg testified that the decision not to go to arbitration was based upon the merits of Motley's case and had nothing to do with Motley's race. [66] ¶ 23.

District Lodge (through Stenberg) advised Motley via telephone on November 9, 2015 that it would not proceed to arbitration, and District Lodge expressed the same in writing no later than November 17, 2015. [66] ¶¶ 22, 24. As a result, Motley's June 2015 termination stood.

### C. Plaintiff's EEOC Charge and This Case

On December 28, 2015, Motley filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) against District Lodge. *Id.* ¶ 26. In that charge, Motley wrote, "During my employment, the Respondent has refused to represent me when I was discharged." *Id.* Motley received a Notice of Right to Sue letter from the EEOC on April 12, 2016. *Id.* ¶ 27. He filed this lawsuit on June 24, 2016.

Motley's pro se complaint alleged claims of race discrimination, retaliation, and breach of fair representation. *Id.* ¶ 27; [1]. With the assistance of recruited counsel, however, Plaintiff withdrew the retaliation and fair representation claims, leaving only the Title VII race discrimination claim. [49]. Defendant moved for summary judgment on this claim. [65]. Plaintiff opposes the motion.

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

8

genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

### III. Analysis

Motley claims that District Lodge declined to take his case to arbitration because of his race, in violation of Title VII. [1]; [49]. Title VII prohibits employers from discriminating against employees on the basis of "race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a); *see also Lewis v. City of Chicago*, 496 F.3d 645, 650 (7th Cir. 2007).

9

In the Seventh Circuit, courts addressing Title VII claims consider all relevant evidence "as a whole," without separating "direct" and "indirect" evidence. *Ortiz v. Werner Enters.*, 834 F.3d 760, 763 (2016). Courts must ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765.

The Seventh Circuit's decision in *Ortiz*, however, did not alter the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Ortiz*, 834 F.3d at 766. As a result, courts addressing discrimination claims now conduct the *McDonnell Douglas* analysis if the parties present arguments "in those terms," but also assess the plaintiff's evidence "cumulatively" to determine "whether it permits a reasonable factfinder" to conclude that the challenged employment action was attributable to a proscribed factor. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Because the parties employ *McDonnell Douglas*, this Court first addresses Plaintiff's claims in those terms and then assesses the evidence under *Ortiz*'s holistic approach. *See id.*

### A. *McDonnell Douglas* Analysis

Motley claims that District Lodge refused to advance his case to arbitration because of his race. [1]; [49]. Motley alleges that genuine issues of material fact exist because: (1) District Lodge's proffered reasons for not bringing his case to arbitration may constitute pretext for discrimination; (2) District Lodge may have adopted the alleged racial bias of witnesses to the altercation (the "cat's paw" theory); and (3)

10

Motley may satisfy his prima facie burden of showing that another similarly situated individual outside the plaintiff's protected class was treated more favorably, by comparing Motley's current treatment with his own past treatment. [75] at 6. District Lodge seeks summary judgment claiming Motley lacks any direct evidence of race discrimination, fails to establish a prima facie case of discrimination under *McDonnell Douglas*, and in any event cannot show that District Lodge's reasons for not arbitrating Motley's case constitute pretext. [69] at 10; [76] at 9–15.

Motley does not offer any direct evidence of discrimination, but he argues that he has established his prima facie case under *McDonnell Douglas*. [75] at 10–11. *McDonnell Douglas* requires plaintiffs to state a prima facie case of discrimination by showing that: (1) he belongs to a protected class; (2) at the time of the adverse action, he was performing reasonably on the job in accordance with Defendant's legitimate expectations; (3) despite his reasonable performance, he suffered an adverse employment action; and (4) similarly situated employees outside of his protected class received more favorable treatment. *See Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765. If Plaintiff states a prima facie case, then Defendant "must articulate a legitimate, nondiscriminatory reason" for the adverse action, at which point the burden reverts to Plaintiff to show that Defendant's explanation is pretextual. *Id.* An inquiry into pretext requires evaluating "the honesty of the employer's explanation, rather than its validity or reasonableness." *O'Leary v. v. Accretive Health, Inc.,* 657 F.3d 625, 636–37 (7th Cir. 2007).

The first three factors do not require much analysis. Here, Motley belongs to a protected class, thus he satisfies the first element of his prima facie case. *See Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). Second, neither party specifically addresses whether Motley's performance met his employer's legitimate expectations apart from the altercation itself, but, but for purposes of this motion, this Court can assume that it did. Even though Stenberg testified that Motley had an "active discipline" on his record, Motley's record was, for the most part, unblemished and he was not in line for any disciplinary measure until the February 25 altercation. Third, neither party addresses the adverse employment action element of the prima facie case, but termination unquestionably qualifies as an adverse employment action (regardless of whether forgoing arbitration does so as well). *E.g., Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017).

Motley cannot, however, show that similarly-situated employees outside his protected class received more favorable treatment. To survive summary judgement under *McDonnell Douglas*, Plaintiff must show that at least one similarly situated employee, outside of his protected class, was treated more favorably than he was. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014). To qualify as similarly situated, the proffered comparator must be "directly comparable" to the plaintiff "in all material respects." *Id.* The similarly-situated determination requires a "common-sense" analysis of relevant factors, including whether the other employee "held the same position, had the same supervisor, was subject to the same standards, and engaged in similar conduct." *Id.* (internal quotation marks omitted). Whether a

comparator is similarly situated is often a question of fact, but this Court may decide it at summary judgment if "no reasonable fact-finder could find" that Plaintiff meets his "burden on the issue." *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012).

Motley claims that Stenberg and the union declined to take his case to arbitration because he is black and the complaining passenger is white. But Motley has offered no evidence to suggest that the union has pursued arbitration for similarly-situated white employees. Indeed, at the hearing on Defendant's motion for summary judgment, Plaintiff's counsel conceded that, even after the Court reopened discovery to allow Plaintiff to explore the issue, Plaintiff could not identify a single similarly-situated employee who had been treated more favorably than Plaintiff. As a result, his claim fails.

### B.   *Ortiz* Analysis

Applying *Ortiz*'s holistic approach yields the same result. Under *Ortiz*, this Court must assess Plaintiff's evidence cumulatively, and ask whether it would permit a "reasonable factfinder to conclude" that his race caused his termination. *Ortiz*, 834 F.3d at 765; *see also David*, 846 F.3d at 224. Based upon this record, it would not. Motley's evidence raises no reasonable inference that improper motives drove District Lodge's actions.

Motley provides no evidence that any of the District Lodge representatives involved in the decision not to bring Motley's case to arbitration acted upon any racial animus; nor do the events around the decision show a discriminatory reason for not appealing Motley's case a second time. *Zegarra v. John Crane, Inc.*, 218 F. Supp. 3d

13

655, 669 (N.D. Ill. 2016) (applying *Ortiz*). Erik Stenberg submitted a declaration in support of Defendant's summary judgment motion stating that neither Plaintiff's "race nor his skin color played any role in the decision not to appeal to arbitration. That decision was based solely on the merits of the case." [67] at ¶ 16. His deposition testimony is consistent: Stenberg testified that the majority of cases he took to arbitration involved black employees. [70] at 42. Stenberg also testified that he did not consider the race of the complaining witness when deciding whether to pursue arbitration, [70] at 42, but decided not to take Motley's case to arbitration because Stenberg did not believe the union could win based on the case facts. *Id.* at 38. He testified "if I thought we had a chance, I would have taken it." *Id.* Even Motley did not say otherwise. When asked at his deposition why he thought the union declined to take the case to arbitration he testified, "I don't know. I can't think for them." [35] at 38. When asked whether he had any evidence that there was any reason other than the conclusion that he could not win that the union decided not to go to arbitration, Motley testified "no, sir." *Id.*

Plaintiff contends that Defendant's decision not to pursue arbitration was influenced by witness statements tinged with racial bias—an argument known as the "cat's paw" theory of liability. The "cat's paw" applies "when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Robinson v. Perales*, 894 F.3d 818, 832 (7th Cir. 2018); *Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015).

14

This case, however, does not involve subordinates. Instead, Plaintiff argues that Stenberg's decision not to pursue arbitration was influenced by the statements of two witnesses (the passenger and the taxi driver) whose accounts may have been colored by racial animus. Plaintiff conceded at the hearing on Defendant's motion that case law has never applied the cat's paw theory of liability in this context.

Moreover, for the cat's paw theory to succeed, a plaintiff must also provide "evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Robinson,* 894 F.3d at 832. Here, Plaintiff's claim seeks to invoke the cat's paw theory by merely noting that the investigative statements mention the passenger's race and Plaintiff's race, and the fact that the passenger said Plaintiff was listening to rap music. This falls far short of establishing that anyone actually harbored discriminatory animus, or that the scheme of the biased subordinate constituted proximate cause.

Instead, the record shows that Stenberg was not influenced by the purportedly biased remarks. The same comments were a part of the record in the first and second stage, where Defendant unquestionably advocated on Motley's behalf and unquestionably fought to prevent Motley's termination. Additionally, Stenberg, who ultimately decided not to pursue Motley's case to arbitration, testified that the statements from the passenger and the taxi driver (i.e., those tinged in Plaintiff's view with racial animus) played little or no role in his decision-making process

15

because they were not as important as Plaintiff's own statements. To Stenberg, Motley's statements, which gave a full and damning confession regarding the incident, were credible precisely because they did not help his case; Stenberg testified that, because such statements incriminated Motley, Motley would not have submitted them if they were not true. [70] at 24–25. After Motley took the position that he (Motley) was somehow "justified to hit the lady," Stenberg testified "that's a statement you gave to the company to defend yourself and they look at something like that, how can they ever feel secure to have him back as an employee with a statement like that, so." *Id.* at 25.

Stenberg, who represented Motley throughout these proceedings, further testified that, after getting the Step 3 decision, he reviewed the file based upon his own experience, and assessed the likelihood that an arbitration would be successful, the potential for damage to future cases, and the finances of whether it was worth taking the case to arbitration. [70] at 32. He discussed the matter with three other people and all were of a similar opinion: that Stenberg would not be successful at arbitration. *Id.* In fact, Stenberg testified that, in his opinion, he had no chance of winning this case in arbitration. *Id.* at 33. According to Stenberg, he considered other cases when making his assessment concerning the likelihood of success with arbitration and ultimately determined that the following facts and factors undermined any chance of success: (1) the egregiousness of Plaintiff's conduct toward a passenger; (2) that Plaintiff was in active discipline, having received warnings within the two years immediately preceding this incident; (3) that Plaintiff refused

to express remorse for the incident; and (4) that Plaintiff was flying on pass privileges at the time of the incident, when he had called off work that day for health reasons. *Id.* at 35-37, 41. Stenberg testified that he did not consider the race of the complaining witness when deciding whether to pursue arbitration. *Id.* at 42. Rather, Stenberg testified that he decided not to take Motley's case to arbitration because Stenberg did not believe the union could win based upon the case facts. *Id.* at 38. He testified "if I thought we had a chance, I would have taken it." *Id.* Nothing in the record contradicts this account.

Because no reasonable jury could conclude that Motley's race motivated District Lodge's decision not to bring his case to arbitration, *Ortiz*, 834 F.3d at 765, this Court grants summary judgment to District Lodge on Motley's discrimination claim, *see Anderson*, 477 U.S. at 252.

IV.  **Conclusion**

For the reasons set forth above, this Court grants Defendant's motion for summary judgment [65]. Judgment is entered in favor of Defendant and against Plaintiff on Plaintiff's complaint [1]. All set dates and deadlines are stricken. Civil case terminated.

Dated: September 20, 2018

Entered:

_____
John Robert Blakey
United States District Judge